IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JEFFREY S. LINDNER, | ) | CIVIL NO.  06-00394 JMS/LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING IN PART AND |
| MEADOW GOLD DAIRIES, INC., | ) | DENYING IN PART THIRD-PARTY |
| | ) | DEFENDANT'S MOTION FOR |
| Defendant, Third- | ) | PARTIAL SUMMARY JUDGMENT |
| Party Plaintiff, and | ) | AND ORDERING ARBITRATION |
| Counter Defendant, | ) | FOR REMAINING MINIMUM |
| | ) | RENT AND PERCENTAGE RENT |
| vs. | ) | CLAIMS |
| | ) | |
| SOUTHERN FOOD GROUP, INC., | ) | |
| | ) | |
| Third-Party | ) | |
| Defendant and | ) | |
| Counter Claimant. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART THIRD-PARTY DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ORDERING ARBITRATION FOR REMAINING MINIMUM RENT AND PERCENTAGE RENT CLAIMS

## I. INTRODUCTION

Third-Party Defendant Southern Foods Group, L.P. ("SFG") moves

the court for partial summary judgment as to the minimum rent and percentage

rent claims asserted in Counts I and II of Plaintiff Jeffrey Lindner's ("Lindner")

Complaint and Counts I and II of Defendant and Third-Party Plaintiff Meadow

Gold Dairies, Inc.'s ("Meadow Gold") Third-Party Complaint.  The court

GRANTS IN PART AND DENIES IN PART SFG's Motion for Partial Summary

Judgment finding that some, but not all, of the claims for additional minimum and

percentage rent are time-barred by Hawaii Revised Statutes ("HRS") § 657-1(1).

The court GRANTS SFG's Motion to Compel Arbitration as to the remaining

additional minimum and percentage rent claims.

## II.  <u>BACKGROUND</u>

### A.    **Factual Background**

Lindner is the fee simple owner of real property in Moloa'a on the

island of Kauai ("Property").  Amfac Property Development Corporation

("Amfac") formerly owned the Property.  On  October 1, 1988, Amfac entered into

a lease with Meadow Gold ("Lease") by which Amfac leased a portion of the

Property ("Leased Parcel") to Meadow Gold for the purposes of operating a dairy

farm.  Amfac assigned its interests under the Lease to Lindner effective June 21,

1996.[1]

The Lease covered a ten-year period with the Lessee reserving the

option to renew for up to three consecutive five-year periods, or a total of up to

---

[1]  Under the Lease, the Lessor had "the right to transfer, convey, or assign this Lease or its interest therein without the prior written consent of the Lessee."  Lease Art. IV § (9).

2

fifteen years.[2]  The Lessee also had an option to terminate the Lease prior to its

expiration by serving written notice and tendering a lump sum cash payment

"representing the present value . . . of the minimum rent due for the remainder of

the term of the Lease, but not more than the present value of five (5) years of

rent."[3]

---

[2]  In relevant part, Article I of the Lease provides:

> (2)  Term.  This Lease shall be for a term of ten (10) years commencing October 1, 1988, and expiring September 30, 1998, subject to earlier termination for Lessee's breach or default as hereinafter provided.
> . . . .
> (3)  Renewal Options.  Lessee shall have the right and option to renew the term of this Lease for up to three (3) additional consecutive terms of five (5) years each, the first such renewal term to immediately follow the initial ten (10) year term of this Lease.  Lessee may exercise each such renewal option, provided it is not then in default, by giving written notice of such exercise to Lessor not less than one (1) year prior to the expiration of the term of this Lease or the current renewal term, as the case may be.

Lease Art. I §§ 2, 3.

[3]  The termination clause provides:

> Lessee may terminate this Lease prior to the expiration of the term upon giving written notice to Lessor of its intent to terminate six (6) months prior to the effective date of such termination, together with a lump sum cash payment representing the present value (capitalized at the then-prevailing Bank of Hawaii prime rate charged to its most responsible commercial customers) of the minimum rent due for the remainder of the term of the Lease, but not more than the present value of five (5) years of rent.  The obligation to pay the present value of five (5) years rent shall apply during the initial ten (10) year term as well as during the three (3) five (5) year option periods described below, including Lessee's failure to

(continued...)

The Lease required the Lessee to pay two types of rent: (1) minimum

rent[4] which was due in quarterly installments and (2) percentage rent[5] which was

---

[3](...continued)
exercise the option on any five (5) year option period.  The foregoing payment shall constitute liquidated damages and not a penalty since the damages to be suffered by Lessor would be difficult to determine if Lessee were to terminate the Lease or fail to exercise any five (5) year option right.

Lease Art. I § 2.

[4]  Article II of the Lease provides for minimum rent as follows:

(1)  Minimum Rent.  Lessee shall pay to Lessor net over and above any and all taxes, rates, assessments and other charges payable hereunder by Lessee with respect thereto, minimum rent for the premises as follows:
(a)  For and during the initial ten (10) year term of this Lease, minimum rent of THIRTEEN THOUSAND AND NO/100 DOLLARS ($13,000.00) per annum, payable quarterly in advance on the first (1st) day of January, April, July and October of each and every year in four (4) equal installments of $3,250.00 each commencing October 1, 1988.  Minimum rent shall be prorated for any period during which this Lease is in effect which includes less than a full calendar quarter.  On the commencement of the term of this Lease, Lessee shall pay to Lessor such a prorated installment of minimum rent.
(b)  For and during the three (3) remaining five (5) year renewal terms, if exercised, the minimum rent shall be the fair market value of the premises, disregarding any improvements erected or placed on the premises by Lessee, as mutually agreed by the parties or, failing such agreement, as determined by arbitration as hereinafter described, but in no event shall such minimum rent be less than the minimum rent for the initial term.

Lease Art. II § 1.

[5]  Article II of the Lease provides for percentage rent as follows:

(2)  Percentage Rent.  Lessee shall pay to Lessor percentage rent less the minimum rent as provided herein based on a percentage of all milk

(continued...)

4

due within 30 days after the end of each calendar year.  Under the terms of the

Lease, "[i]n the event the parties cannot agree upon the minimum rent and

percentage rent for the final three (3) five (5) year renewal terms, or an alternative

method of establishing the milk price for calculating gross revenues, the matter

shall be submitted to arbitration . . . ."[6]  Lease Art. II § 3.

---

[5](...continued)
produced on the premises.  The price for the milk produced on the
premises shall be as established for Oahu milk producers by the State of
Hawaii Department of Agriculture.  The percentage rent payable hereunder
shall be the total amount of milk produced on the premises times the price
of the milk times the following percentages:

| | |
|---|---|
| 1st year | 1.500% |
| 2nd year | 1.625% |
| 3rd year | 1.750% |
| 4th year | 1.875% |
| 5th-10th year | 2.000% |

. . . .
The percentage rent payable for the remaining three (3) five (5)
year renewal terms shall be as mutually agreed upon or, failing such
agreement, as determined by arbitration as hereinafter provided, to be
calculated based upon the fair market value of the premises based upon the
use thereof exclusive of improvements placed thereon by Lessee, but in no
event shall such percentage rent be less than the percentage rent paid for
the immediately preceding five (5) year term.
. . . .
Percentage rent for each year shall be paid at the time of and
together with the delivery to Lessor of the statement of gross revenues for
such year.  The minimum rent and percentage rent shall be prorated as
appropriate for any period less than a full calendar year.

Lease Art. II § 2.

[6]  The Lease provides that a dispute over minimum rent or percentage rent or milk price
shall be determined as follows:

(continued...)

On May 28, 1997, Meadow Gold exercised its option on all three renewal terms under Article I § 3, thereby extending the Lease until September 30, 2013.  *See* SFG's Mot. for Partial Summ. J. Exs. B & C.[7]  A little over three months later, on September 4, 1997,  Meadow Gold assigned its interests and obligations under the Lease to SFG ("1997 Assignment and Assumption Agreement").  *See* Meadow Gold's Third-Party Compl. Ex. A.  Under the 1997 Assignment and Assumption Agreement, SFG agreed to "assume[] all of [Meadow Gold's] obligations under each Lease arising on or after the effective date [September 4, 1997] . . . ."  *Id.*  Nonetheless, the Lease provided that "[i]n the event of an assignment . . . Lessee shall not be released from any liability or obligations under the Lease, Lessor reserving all of its rights and remedies against

---

[6](...continued)
> . . . .
>> Either party shall give to the other party written notice of its desire to have the rent or price determined by arbitration.  Within ten (10) days after receipt of the notice, the parties shall select a mutually agreeable arbitrator to determine the issue.  In the event the parties cannot agree on a single arbitrator such arbitrator shall be selected by the executive officer of the Honolulu office of the American Arbitration Association.  The arbitrator selected (by either method) shall proceed to determine the minimum rent and percentage rent for the remaining 15 year term. . . .  The decision of the arbitrator shall be final and binding on both parties. . . .

Lease Art. II § 3.

[7]  Meadow Gold informed Amfac of its intention to renew the Lease on March 6, 1996 and informed Lindner of its intention to renew the Lease on May 28, 1997.

Lessee hereunder." Lease Art. IV § (9).

From October 1, 1998 (the expiration date of the original ten-year Lease term) to December 31, 2000, Lindner and SFG engaged in rent negotiations to determine the fair market value of the minimum rent.[8]  During this time, SFG continued to pay $13,000 per year (for a total of $29,250), the amount set forth by Article II § 1(a) as minimum rent for the pendency of the original ten year term. Lindner alleges that this amount did not represent the fair market rental value of the Leased Parcel.  SFG also continued to make percentage rent payments, but Lindner alleges that such payments were not based on the fair market value of the property as required by Article II § 2.  The parties failed to reach an agreement regarding both the minimum rent and the percentage rent for the renewal terms. Neither party submitted the matter to arbitration pursuant to Article II § 3.

## B.    Procedural Background

Lindner filed suit against Meadow Gold (but not SFG) on July 19, 2006.  Count I seeks additional minimum rent based on the fair market value of the Leased Parcel for the period from October 1, 1998 to December 31, 2000 and Count II seeks additional percentage rent from October 1, 1998 to December 31, 2000.  Meadow Gold answered Lindner's Complaint on November 16, 2006.  On

---

[8] Meadow Gold apparently vacated the Leased Parcel on December 31, 2000.

December 1, 2006, Meadow Gold filed a Third-Party Complaint impleading SFG based on the 1997 Assignment and Assumption Agreement. On January 8, 2007, SFG answered Meadow Gold's Third-Party Complaint and filed a Counterclaim against Meadow Gold.

On February 7, 2007, SFG filed a Motion for Partial Summary Judgment as to Counts I and II of Lindner's Complaint and Counts I and II of Meadow Gold's Third-Party Complaint, and, in the alternative, a Motion to Compel Arbitration for any remaining claims for additional minimum or percentage rent. Meadow Gold joined SFG's Motion for Partial Summary Judgment as to Counts I and II of Lindner's Complaint and, in the alternative, to Compel Arbitration. Lindner filed his Opposition on March 22, 2007.[9] SFG filed its Reply on March 29, 2007. The court heard oral argument from Lindner,

---

[9] In his opposition, Lindner requested a continuance pursuant to Federal Rule of Civil Procedure 56(f) (incorrectly cited by Lindner as a Hawaii Rule of Civil Procedure) "if this Court is not inclined to deny Southern Foods' Motion." Lindner's Mem. in Opp. at 18. A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment. *See Tatum v. City & County of S.F.*, 441 F.3d 1090 (9th Cir. 2006). Lindner has failed to do so, and as a result the court denies the request for continuance. *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002) ("Failure to comply with [the requirements of Rule 56(f) ] is a proper ground for denying relief.").

Instead of providing an affidavit as required by Rule 56(f), Lindner simply claims that SFG failed to comply with Local Rule 56.1(a), requiring a "separate concise statement detailing each material fact as to which the moving party contends that there are no genuine issues to be tried that are essential for the court's determination of the summary judgment motion." Although Lindner argues that he is prejudiced by the lack of this information, the record discloses that he has suffered no prejudice from SFG's failure to file a separate concise statement of facts.

Meadow Gold, and SFG on April 9, 2007.

### III. <u>STANDARDS OF REVIEW</u>

**A.     Summary Judgment Standard**

A party is entitled to summary judgment where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, summary judgment will be mandated if the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

**B.     Choice of Law in Diversity Cases Brought Under 28 U.S.C. § 1332**

The court has diversity jurisdiction over Lindner's claims under 28 U.S.C. § 1332.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity cases apply federal procedural rules and substantive state law.  "In the absence of controlling state law, a 'federal court sitting in diversity

must use its own best judgment in predicting how the state's highest court would decide the case.'" *Tirona v. State Farm Mut. Auto Ins. Co.*, 812 F. Supp. 1083, 1085 (D. Haw. 1993) (citations omitted).

## IV.  ANALYSIS

### A.   Third-Party Defendant Southern Food Group May Raise a Statute of Limitations Defense to Defeat Plaintiff Lindner's Complaint Under Federal Rule of Civil Procedure 14(a)

Lindner first argues that SFG's Motion for Partial Summary Judgment is procedurally flawed, claiming that under Hawaii law, the statute of limitations defense may be raised only by Meadow Gold.  The court rejects Lindner's argument and finds that under Federal Rule of Civil Procedure 14(a), SFG may properly move the court for summary judgment as to Lindner's claims against Meadow Gold on the basis that Lindner's claims are untimely.

Where a question is directly covered by a Federal Rule of Civil Procedure, a federal court sitting in diversity jurisdiction must apply the terms of the Rule, even if the matter is arguably "substantive" under Erie.  *See Knieval v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 2005) ("[F]ederal courts sitting in diversity must apply the Federal Rules of Civil Procedure.").  As the Supreme Court directed,

When a situation is covered by one of the Federal Rules, the

10

> question facing the court is a far cry from the typical, relatively
> unguided Erie Choice: the court has been instructed to apply
> the Federal Rule, and can refuse to do so only if the Advisory
> Committee, this Court, and Congress erred in their prima facie
> judgment that the Rule in question transgresses neither the
> terms of the Enabling Act nor constitutional restrictions.

*Hanna v. Plumer*, 380 U.S. 460, 471 (1965).

The text of Rule 14(a) is "sufficiently broad to control the issue"

before the court and as such "covers the point in dispute." *See Stewart Org., Inc.*

*v. Ricoh Corp.*, 487 U.S. 22, 26-27 (1988); *Burlington N. R.R. Co. v. Woods*, 480

U.S. 1, 4-5 (1987); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980).

Under Rule 14(a), a "third-party defendant may assert against the plaintiff *any*

defenses which the third-party plaintiff has to the plaintiff's claim." (Emphasis

added.)  The rationale underlying Rule 14(a)'s provision is two fold:  First, Rule

14(a) helps to reduce the risk of collusion between Lindner and Meadow Gold (a

concern of increased importance where, as here, there is an assignment and

assumption agreement which could obligate SFG to cover damages stemming

from Lindner's claims).  Second, since SFG cannot relitigate the question of

Meadow Gold's liability to Lindner, Rule 14(a) prevents the prejudice or

unfairness that could result from Meadow Gold's failure (for whatever reason) to

assert the appropriate defenses.  As the Advisory Committee Notes explain:

11

> [R]ule 14(a) has been expanded to clarify the right of the third-party defendant to assert any defenses which the third-party plaintiff may have to the plaintiff's claim.  This protects the impleaded third-party defendant where the third-party plaintiff fails or neglects to assert a proper defense to the plaintiff's action.

Fed. R. Civ. P. 14(a) Advisory Comm. Notes to 1946 Amendment.  As further explained:

> [I]t would be unfair to impose liability on the third-party defendant if the defendant failed to assert defenses available to it on the underlying claim.  To avoid this possibility, the fifth sentence of the impleader rule provides that "the third-party defendant may assert against the plaintiff any defenses which the third-party has to the plaintiff's claim." . . .  Although the plaintiff and the third-party defendant are not technically opposing parties . . . the impleader rule recognizes the derivative nature of the third-party defendant's potential liability and permits it essentially to stand in the defendant's shoes and assert its defenses . . . .

Moore's Federal Practice § 14.25 (Matthew Bender 3d).

The statutory purposes of Rule 14(a) -- to prevent collusion and avoid the prejudice and unfairness that would result by subjecting a third-party defendant to a judgment which it had no opportunity to defend against -- would be undermined by allowing a third-party defendant to assert only a portion of the defenses available to the defendant/third-party plaintiff.  *Cf. Williams v. Globe Indem. Co.*, 507 F.2d 837, 839 (8th Cir. 1974) ("The theory of subrogation is that

the subrogee steps into the shoes of his subrogor.  As such, he takes subject to *all*

defenses which the third party could have asserted against the subrogor, including

the statute of limitations . . . .") (emphasis added).  Rule 14(a) therefore allows

SFG to stand in Meadow Gold's shoes for the purposes of defending against

Lindner's claims.

Because the question before the court is directly covered by Rule

14(a), an in-depth *Erie* analysis is not necessary.  Instead, the court must only

confirm that Rule 14(a) does not contravene the Constitution or Congress' grant of

authority under the Rules Enabling Act.  *See Stewart Org., Inc.*, 487 U.S. at 27.

Rule 14(a) easily passes constitutional muster.  *See Hanna*, 380 U.S. at 472 ("the

constitutional provision for a federal court system . . . carries with it congressional

power to make rules governing the practice and pleading in those courts, which in

turn includes a power to regulate matters which, though falling within the

uncertain area between substance and procedure, are rationally capable of

classification as either.").

The Rules Enabling Act, 28 U.S.C. § 2072(b), authorizes the adoption

of the Federal Rules of Civil Procedure, but provides that "such rules shall not

abridge, enlarge or modify any substantive right."  A Rule which "relates to the

'practice and procedure of the district courts'" passes muster under the Rules

13

Enabling Act.  *Hanna*, 380 U.S. at 464 (citation omitted).  As the Court has

explained, "[t]he test must be whether a rule really regulates procedure, the

judicial process for enforcing rights and duties recognized by substantive law and

for justly administering remedy and redress for disregard or infraction of them."

*Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941).  Rule 14(a) is exactly that -- a

procedural rule which governs third-party practice.[10]  Accordingly, the court finds

that SFG may assert a statute of limitations defense against Meadow Gold.[11]

---

[10]  The court therefore need not rule whether, in its opinion, the Hawaii Supreme Court would allow a third-party defendant to assert the statute of limitations as a defense against a plaintiff's complaint in state court: Federal Rule of Civil Procedure 14(a) directly covers the question and this court must apply the Rule irrespective of any contrary Hawaii state law.

In any event, the court rejects Lindner's argument that under Hawaii law the statute of limitations defense is personal to a defendant and cannot be raised by other parties, including third-party defendants.  In support of his argument, Lindner cites to *City Collectors, Ltd. v. Moku*, 50 Haw. 273, 439 P.2d 217 (1968), and *Mauian Hotel, Inc. v. Maui Pineapple Co., Ltd.*, 52 Haw. 563, 481 P.2d 310 (1971).  Neither *City Collectors* nor *Mauian Hotel* bars a party standing in the shoes of a defendant from raising a statute of limitations defense.  Other Hawaii Supreme Court precedent that refers to the statute of limitations defense as a "personal" defense does so as a means of explaining that the privilege of electing to assert or waive the defense belongs to the defendant and may not be raised by the court sua sponte.  *See Borba v. Kaina*, 22 Haw. 721 (1915); *Dillingham v. Scott*, 20 Haw. 4 (1910); *Norris v. De Herblay*, 9 Haw. 566 (1894).  No Hawaii precedent indicates that the ability to assert the statute of limitations defense under Hawaii law does not belong to the defendant *and* any party standing in the defendant's shoes.  On the contrary, the language of Hawaii Rule of Civil Procedure 14(a) is identical to Federal Rule of Civil Procedure 14(a), thus permitting a third-party defendant to raise "any" defense properly asserted by the defendant.

[11]  Lindner incorrectly argues that Meadow Gold waived the statute of limitations defense under the terms of the Lease.  According to Lindner, Meadow Gold "waived the benefits of the applicable statute of limitations by agreeing" to the following provision:

(2)  Nonwaiver.  Acceptance of minimum rent or percentage rent by Lessor or its employees or agent(s) shall not be deemed to be a waiver by

(continued...)

14

**B.**    **SFG Is Entitled to Summary Judgment for Claims Related to Minimum Rent and Percentage Rent Due on or Prior to July 19, 2000 as Such Claims Are Time-Barred Under HRS § 657-1(1)**

Determining the point at which the statutory period commences is a

substantive matter of Hawaii state law.  *See Walker v. Armco Steel Corp*, 446 U.S.

--------

[11](...continued)

> Lessor of any breach by Lessee of any covenant herein contained or of Lessor's right to re-enter for breach of condition.  Waiver by Lessor of any breach by Lessee shall not operate to extinguish the term, covenant, or condition, the breach whereof has been waived, nor be deemed to be a waiver of Lessor's right to declare a forfeiture for any other breach thereof.

Lease Art. V. § 2.  Nothing in this provision, however, refers to, let alone waives, a statute of limitations defense; nor does it grant the Lessor an unlimited period of time in which to file a claim for breach of contract.  Instead, Article V § 2 clarifies that partial payment shall not be deemed payment in full and that acceptance of partial payment shall not abridge the Lessor's rights to pursue additional rent due.  In other words, the cited provision allows Lindner to accept partial payment of rent without waiving his right as Lessor to pursue redress against the Lessee for the additional rent due thereunder -- but under HRS § 657-1(1), such claims for redress must be timely filed.

Lindner does not claim that SFG failed to raise the statutes of limitations as required under Federal Rule of Civil Procedure 8(c) (requiring a defense on statute of limitations to be affirmatively asserted in the Answer).  Indeed, SFG did timely raise the statute of limitations defense in both its Answer to the Third-Party Complaint and Counterclaim.  *See* Third-Party Def's Answer to Third-Party Compl. 4; Third-Party Def's. Counterclaim ¶ 44.  Meadow Gold, however, failed to specifically assert a statute of limitations defense in its Answer, instead averring

> The Defendant gives notice that it intends to rely upon any other matter constituting an avoidance of affirmative defense as set forth in Rule 8(c) of the Federal Rules of Civil Procedure, and that it intends to seek leave to amend this answer to specifically allege those defense s of which it may become aware of during the course of further investigation, discovery, or trial of this matter.

Def.'s Answer 7.  Meadow Gold's failure to specifically assert a statute of limitations defense -- and its failure thus far to move under Federal Rule of Civil Procedure 15 to amend its Answer to so include -- does not waive SFG's ability to raise the defense as this is precisely the unfairness and prejudice that Rule 14(a) was intended to avoid.

15

740, 751-53 (1980); *Ragan v. Merch. Transfer & Warehouse Co.*, 337 U.S. 530,

533-34 (1949)*; Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 109-10 (1945).  HRS

§ 657-1(1) provides that contract claims "shall be commenced within six years

next after the cause of action accrued."  Lindner filed his Complaint on July 19,

2006.  Under the explicit language of HRS § 657-1(1), any of Lindner's claims

which accrued on or before July 19, 2000 are time-barred.

         To determine whether any of Lindner's claims are time-barred, the

court must ascertain when claims stemming from a failure to tender rent payments

"accrue" under Hawaii law.  Lindner argues that his claims did not accrue, and the

statute of limitations did not begin to run, until he elected to treat the Lease as

terminated on December 31, 2000,[12] giving Lindner until December 31, 2006 to

file his Complaint.  In contrast, SFG argues that, for the purpose of triggering the

statute of limitations, Lindner's additional rent claims accrued on or before

October 1, 1998, the date by which the parties were obligated to determine and set

the new fair market value minimum rent under the Lease.  Under SFG's theory,

Lindner had until October 1, 2004 to file his claims.  The court disagrees with

both, and finds that under Hawaii law, a cause of action for rent accrues upon the

---

[12] Lindner argues that December 31, 2000 marks the (allegedly unlawful) termination of the Lease as that is the date when Meadow Gold vacated the Leased Parcel. *See* Pl's. Ex. 3

due date of each rental payment.

The court applies Hawaii contract law to its determination of when a claim accrues under a lease.  *See HI Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc.*, 84 Haw. 75, 78, 929 P.2d 88, 91 (1996) ("Leases are essentially contractual in nature and are reviewed under the principles of contract law.").  As the Hawaii Supreme Court observed when applying the statute of limitations contained in the Revised Laws of Hawaii § 10421 (1945):[13]

> To enable determination of whether the six-year limitation had expired against plaintiff-appellant's cause of action, inquiry must specifically be first directed to a determination of when the cause of action accrued to plaintiff-appellant.  "'A right of action accrues whenever such a breach of duty or contract has occurred, or such a wrong has been sustained, as will give a right to then bring and sustain a suit.  That the statute begins to run from the time a right of action accrues, without regard to when the actual damage results, is well settled. . . .  If an act occurs, whether it be a breach of contract or duty which one owes another or the happening of a wrong, whether willful or negligent, by which one sustains an injury, however slight, for which the law gives a remedy, that starts the statute.'"

*Schimmelfennig v. Grove Farm Co., Ltd.*, 41 Haw. 124, 130 (1955) (*quoting*

---

[13]  Section 10421, the statutory predecessor to HRS § 657-1(1), provided in relevant part:

The following actions shall be commenced within six years next after the cause of such action accrued, and not after:
1.      Actions for the recovery of any debt founded upon any contract, obligation or liability, excepting such as are brought upon the judgment or decree of some court of record . . . .

*Aachen & Munich Fire Ins. Co. v. Morton*, 156 F. 654, 656-57 (6th Cir. 1907))

(other citations omitted).  More recently, in *Blair v. Ing*, 95 Haw. 247, 264,

21 P.3d 452, 469 (2001), the Hawaii Supreme Court held that under "the

traditional 'occurrence rule,' . . . . the accrual of the statute of limitations begins

when the negligent act occurs or the contract is breached."  *See also Au v. Au*, 63

Haw. 210, 219, 626 P.2d 173, 180 (1981) ("Normally, the statute of limitations

begins to run on a contract when the contract is breached.").

Under Hawaii law, a lessor may proceed with suit seeking remedy

under one of a number of different theories.[14]  However, whatever theory the

lessor selects, his or her cause of action accrues at the time the lessee failed to pay

the full rent due.[15]

_____

[14]  As the Hawaii Supreme Court explained,

> Under the common law, if a tenant breaches a lease, a landlord may: (1) terminate the tenancy and sue for damages under breach of contract theory; (2) elect to continue the tenancy, and sue periodically for rent as it accrues; or (3) terminate the lease, retake possession, and absolve tenant from all liability.

*HI Kai Inv., Ltd.,* 84 Haw. at 80, 929 P.2d at 93.

[15]  This ruling is consistent with various other courts which have held that a breach of contract claim accrues on the date a periodic payment -- whether rent, an installment payment, or another form -- is due.  *See, e.g., F.D. Stella Prods. Co. v. Scott*, 875 S.W.2d 462, 465-66 (Tex. App. 1994) ("For breach of contracts requiring fixed, periodic payments, Texas law is clear that a separate cause of action arises for each missed payment.  . . .  We conclude that leases should be treated as installment contracts for the purpose of the accrual of a cause of action and the running

(continued...)

Lindner's cause of action thus accrued after the payment of allegedly insufficient minimum rent on October 1, 1998, the first date minimum rent was due under the renewed Lease.[16]   Each subsequent alleged failure of the Lessee to pay adequate minimum rent on the due date, including January 1, 1999; April 1, 1999; July 1, 1999; October 1, 1999; January 1, 2000; April 1, 2000; July 1, 2000; and October 1, 2000, gave rise to additional claims or causes of action.   Similarly, Lindner's cause of action accrued after the payment of allegedly insufficient percentage rent on January 30, 1999, the first percentage rent due date under the renewed Lease.   The alleged failure of the Lessee to pay sufficient percentage rent on January 30, 2000 and January 30, 2001, gave rise to two additional causes of action.

The court thus finds that any rent payments due on or before July 19,

---

[15](...continued)
of the applicable statute of limitations."); *U.S. Leasing Corp. v. Everett, Creech, Hancock & Hyerzig*, 363 S.E.2d 665, 669 (N.C. App. 1988) (finding that the statute of limitations runs against each monthly installment payment when it becomes due under the terms of a lease); *Davenport v. Stratton*, 149 P.2d 4, 14 (Cal. 1944) (finding that the statute of limitations applies to each lease payment as a separate cause of action).

[16]   Lindner implies that because he did not know the fair market value of the real property, he did not know of the occurrence of the breach and that the statute of limitations should therefore be tolled.   The court rejects this argument: Lindner could have exercised due diligence to discover the fair market value of the property (indeed, the arbitration clause provision explicitly provided a mechanism by which he could do so).   *See Basque v. Yuk Lin Liau*, 50 Haw. 397, 398, 441 P.2d 636, 637-38 (1968) (finding that a cause of action accrues and the applicable statutes of limitations begins to run when a plaintiff "knew or in the exercise of reasonable care should have discovered that an actionable wrong has been committed").

2000 are time-barred.  The only claims for insufficient rent which were timely

filed are those for minimum rent originally due on October 1, 2000 and percentage

rent originally due January 30, 2001.

## C.   Parties Are Ordered Into Arbitration Regarding the Issues of Minimum Rent and the Percentage Rent Due for the Remaining Claims Under HRS § 658A-7

"When presented with a motion to compel arbitration, the court is

limited to answering two questions: 1) whether an arbitration agreement exists

between the parties; and 2) if so, whether the subject matter of the dispute is

arbitrable under such agreement."  *Koolau Radiology, Inc. v. Queen's Med. Ctr.*,

73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992).  The court considers each in turn.

### 1.   *A Valid Arbitration Agreement Exists; SFG May Move to Compel Arbitration Under the Lease*

Where there is an arbitration agreement between parties, the court

"shall . . . order the parties to arbitrate unless it finds that there is no enforceable

agreement to arbitrate."  HRS § 658A-7(a)(2).  Where there is no enforceable

arbitration agreement, the court "shall not, pursuant to subsection (a) . . . order the

parties to arbitrate."  HRS § 658A-7(c).

The parties do not dispute that the Lease contains a valid arbitration

clause.  *See* Lease Art. II § 3; *see also* HRS § 658-1 ("a provision in a written

20

contract to settle by arbitration a controversy thereafter arising out of the

contract . . . shall be valid, enforceable, and irrevocable save only upon such

grounds as exist for the revocation of the contract . . . .").  However, Lindner

claims that the arbitration clause is valid only as to Meadow Gold and that SFG

lacks privity to enforce it, claiming that "[t]here was never a 'meeting of the

minds' or 'mutual assent' to arbitrate because [Lindner] never consented to enter

into arbitration with [SFG]."  It is true that parties may not be forced to arbitrate

their disputes absent an agreement to do so.  Nonetheless, the court finds that SFG

may enforce the Lease's arbitration clause under Hawaii law.  As explained by the

Hawaii Supreme Court,

> There are two circumstances under which a nonsignatory can
> compel arbitration.  First, when the signatory to a written
> agreement containing an arbitration clause must rely on the
> terms of the written agreement in asserting its claims against
> the nonsignatory.  Second, when the signatory to the contract
> containing a[n] arbitration clause raises allegations of
> substantially interdependent and concerted misconduct by both
> the nonsignatory and one or more of the signatories to the
> contract.  In other words, a signatory to an arbitration
> agreement is estopped from refusing to arbitrate claims against
> a nonsignatory when the signatory's claims are intertwined
> with, rather than independent of, the agreement containing the
> arbitration clause[.]

*Luke v. Gentry Realty*, 105 Haw. 241, 247-48, 96 P.3d 261, 268 (2004) (citations

omitted); *see also MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.

21

1999) ("There are certain limited exceptions . . . that allow nonsignatories to a

contract to compel arbitration.  A[n] . . . exception exists when, under agency or

related principles, the relationship between the signatory and nonsignatory

defendants is sufficiently close that only by permitting the nonsignatory to invoke

arbitration may evisceration of the underlying arbitration agreement between the

signatories be avoided.") (citation omitted).  The second scenario applies in this

case: Although Lindner did not name SFG in his suit, he has raised allegations of

interdependent misconduct by both Meadow Gold and SFG.

            Under the terms of Article II § 3, Lindner was obligated to arbitrate

claims against the Lessee regarding the amount of minimum rent and percentage

rent due.  Because Lindner's claims are intertwined with the agreement containing

the arbitration clause, he is estopped from arguing that he only agreed to arbitrate

those claims with Meadow Gold (as opposed to SFG, the assignee).  Further,

Lindner has not demonstrated any prejudice that could result from ordering him to

enter into arbitration with SFG as to the precise claims he agreed to arbitrate with

Meadow Gold.[17]  The court therefore finds that SFG can move to compel

---

[17]  As an additional basis for its finding, the court notes that Meadow Gold has joined in SFG's Motion for Partial Summary Judgment and Motion to Compel Arbitration.  Once the court grants Meadow Gold's joinder, denying SFG's motion would make little sense and place form over substance.

arbitration of the additional rent due.

### 2.    *Questions of Additional Rent Due Are Arbitrable Under the Lease*

The final question remaining for the court is which of Lindner's

claims the arbitration clause covers.  Here, the explicit terms of the Lease provide

that the arbitration clause applies "in the event the parties cannot agree upon the

minimum rent and percentage rent for the final three (3) five (5) year renewal

terms, or an alternative method of establishing the milk price for calculating gross

revenues . . . ."  Lease Art. II § 3.  Under HRS § 658A-7 and the arbitration

agreement contained in the Lease, the court orders the parties into arbitration as to

the amount of minimum rent originally due on October 1, 2000 and the amount of

percentage rent originally due on January 30, 2001.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court ORDERS Lindner, Meadow Gold

and SFG into arbitration as to what additional rent is due, if any, on Lindner's

claims for minimum rent originally due on October 1, 2000 and percentage rent

originally due on January 30, 2001.  SFG is entitled to summary judgment on all

\\\

\\\

\\\

other claims for additional minimum and percentage rent contained in Counts I

and II of the Complaint and Counts I and II of the Third-Party Complaint.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 11, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Order Granting in Part and Denying in Part Third Party Defendant's Motion for Partial Summary Judgment and Ordering Arbitration for Remaining Minimum Rent and Percentage Rent Claims