IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JEFFREY S. LINDNER, | ) | CIVIL NO.  06-00394 JMS/LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING PLAINTIFF'S |
| MEADOW GOLD DAIRIES, INC., | ) | MOTION FOR PARTIAL |
| | ) | SUMMARY JUDGMENT AND |
| Defendant, Third- | ) | DENYING THIRD-PARTY |
| Party Plaintiff, and | ) | DEFENDANT'S |
| Counter Defendant, | ) | COUNTERMOTION FOR PARTIAL |
| | ) | SUMMARY JUDGMENT AS TO |
| vs. | ) | COUNT III (LIQUIDATED |
| | ) | DAMAGES) |
| SOUTHERN FOOD GROUP, INC., | ) | |
| | ) | |
| Third-Party | ) | |
| Defendant and | ) | |
| Counter Claimant. | ) | |
| _____ | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING THIRD-PARTY DEFENDANT'S COUNTERMOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT III (LIQUIDATED DAMAGES)

## I.  INTRODUCTION

Plaintiff Jeffrey Lindner ("Lindner") and Third-Party Defendant

Southern Food Group, L.P. ("SFG") have moved for partial summary judgment as

to Lindner's claim for liquidated damages, asserted in Count III of his Complaint.

Lindner argues that the plain language of the Lease entitles him to a lump sum

liquidated damages cash payment.  The court agrees and rejects SFG's arguments that performance under the Lease was frustrated and that the allegedly insufficient notice by Lindner relieved it of any contractual obligation to pay liquidated damages.  The court therefore GRANTS Lindner's Motion for Partial Summary Judgment and DENIES SFG's Countermotion for Partial Summary Judgment as to Count III of the Complaint.

## II.  BACKGROUND

This is the second round of motions for partial summary judgment in this case.  Additional background was set forth in the court's first Order, *Lindner v. Meadow Gold Dairies, Inc.*, 2007 WL 1430373 (D. Haw. May 14, 2007).

### A.    Factual Background

Lindner is the fee simple owner of real property leased to Meadow Gold Dairies, Inc. ("Meadow Gold") under a 1988 Lease ("Lease").[1]  On May 28, 1997, Meadow Gold exercised its renewal options, extending the Lease until September 30, 2013.  A few months later, Meadow Gold assigned its interests and

---

[1]  The original fee simple owner of the property, Amfac Property Development Corporation ("Amfac"), entered into the Lease with Meadow Gold on October 1, 1988.  Amfac sold its fee simple interest in the land to Lindner and assigned him its interests and obligations under the Lease on June 21, 1996.  *See* Lease Art. IV § 9 ("Lessor shall have the right to transfer, convey or assign this Lease or its interest therein without the prior written consent of Lessee.").

obligations under the Lease to SFG.[2]

Meadow Gold leased the land, located on the island of Kauai, to operate a dairy farm ("Moloa'a Dairy Farm").  The downstream parcel was originally occupied by the Papa'a Bay Ranch, a working ranch.  On January 15, 1998, a little over four months before Meadow Gold exercised its right to a fifteen-year renewal of the Lease, the downstream parcel was sold to Mandalay Properties Hawai'i, Inc. ("Mandalay") and developed into the "Tara Plantation," a 15,000 square foot, 6 bedroom, 8.5 bath, two-living room home with two separate 4,000 square foot guest bungalows, a spring-fed swimming pool, and an on-site yoga studio.[3]  The Tara Plantation was originally developed as one of the personal homes of Peter Guber ("Guber"), principal of Mandalay and current chairman and owner of film production company Mandalay Entertainment.

The relationship between neighbors Guber and Meadow Gold quickly soured.  In an April 1999 meeting with representatives of SFG, Guber stated that

---

[2] Lindner disputes the validity of this assignment, arguing that Meadow Gold and SFG did not receive his prior written consent, as is required by Lease Article IV § 9.  *See* Pl's. Mot. for Partial Summ. J. Concise Stmt. of Facts No. 13; Pl's. Reply, Lindner Decl. ¶ 12.  SFG responds that Lindner was informed of the intended assignment but that he irrationally delayed and withheld his written consent.  *See* SFG's Mot. for Partial Summ. J. Exs. F & V.  Neither party has asked the court to rule on this issue or explained its relevance to the present motion.

[3] The Tara Plantation was recently listed for sale at 46.5 million dollars.

he planned to spend millions of dollars developing Tara Plantation and that the Moloa'a Dairy Farm (then still in operation upstream) "was a good farm, but in a bad location."  Michael Koenig ("Koenig"), the Vice President of Operations of SFG, understood these statements to mean that the dairy farming operations were too close to Guber's property.  SFG's Mot. for Partial Summ. J., Koenig Decl. ¶ 4. During the meeting, Guber allegedly emphasized his contacts with environmental organizations and national media outlets.  *Id.* ¶ 3.

By letter dated April 23, 1999, Mandalay complained of raw sewage and contamination of its downstream land and water and asserted Meadow Gold's liability.  *See* Pl's. Mot. for Partial Summ. J. Ex. 13.  Guber also filed a complaint regarding manure on the Moloa'a Dairy Farm with the Hawaii Department of Health and sent Lindner "a threatening letter asking [Lindner] to pay damages." Pl's. Reply, Lindner Decl. ¶¶ 20, 22.  Lindner agreed to cover some of Guber's costs in retaining consultant Brad Finney.  Pl's. Reply, Lindner Decl. ¶ 49.

On February 10, 2000, Mandalay provided notice that it intended to file a "citizen's lawsuit" against Meadow Gold on the grounds that the operation of the Moloa'a Dairy Farm violated the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act").  SFG's Mot. for Partial Summ. J. Ex. J.  Specifically, Mandalay asserted that the Moloa'a Dairy Farm was a "point source" under 33

U.S.C. § 1362(14) because it was a "concentrated animal feeding operation" as defined by 40 C.F.R. § 122.24(b)(3).  Mandalay alleged that Meadow Gold's operations at the Moloa'a Dairy Farm violated the provisions of the Clean Water Act by discharging pollutants in contravention of the "zero discharge performance" standard set forth in 40 C.F.R. § 412.15;[4] failing to design and construct a facility for all areas of the land parcel which could contain wastewater and runoff water from a catastrophic rainfall as required by 40 C.F.R. § 412.15(b);[5] and failing to obtain a National Pollution Discharge Elimination System ("NPDES") permit under 40 C.F.R. § 122.1(b).  Mandalay attested that it would seek the maximum civil penalty of $25,000 per day per violation.  SFG's Mot. for Partial Summ. J. Ex. J.

Following receipt of Mandalay's intent to sue letter, SFG contacted the Hawaii Department of Health (which administers the Clean Water Act in Hawaii) to inquire whether Meadow Gold was required to maintain facilities on all of its dairy fields -- and not just the Moloa'a Dairy plant itself -- which would be

---

[4]  Under 40 C.F.R. § 412.15(a), Meadow Gold must prevent any discharge of wastewater pollutants from the Moloa'a Dairy into U.S. waters.  The only exception to this "zero discharge" standard is in the event of a chronic or catastrophic rainfall which causes an overflow of water from a facility designed, constructed, and equipped to contain wastewater and runoff water from a 25-year, 24-hour rainfall event.  40 C.F.R. § 412.15(b).

[5]  Mandalay asserted that the entire Moloa'a Dairy Farm -- including the pasture fields -- was subject to the facility requirements of 40 C.F.R. § 412.15(b).

5

able to handle a continuous and catastrophic rainfall.  The Hawaii Department of

Health was not able to give SFG a firm opinion on the matter.  SFG's Mot. for

Partial Summ. J., Matsunaga Decl. ¶ 3.

Shortly thereafter, Meadow Gold announced the closure of the

Moloa'a Dairy Farm, explaining in a press release that "the decision to close the

farm was driven by the realities of market and regulatory forces that have changed

over the years."  SFG's Mot. for Partial Summ. J. Ex. P.

Meadow Gold terminated the Lease effective December 31, 2000,[6]

almost thirteen years early.  In several letters to Lindner, SFG requested that

Lindner waive the liquidated damages provision contained in the Lease.  *See* Pl's.

Mot. for Partial Summ. J. Exs. 5 & 6; SFG's Mot. for Summ. J. Ex. I.  The

liquidated damages provision provides:

> Lessee may terminate this Lease prior to the expiration of the
> term upon giving written notice to Lessor of its intent to
> terminate six (6) months prior to the effective date of such
> termination, together with a lump sum cash payment
> representing the present value (capitalized at the then

---

[6] Lindner argues that Meadow Gold ended its tenancy of the land on December 31, 2000, but that the Lease was not terminated on this date because Meadow Gold did not tender proper notice accompanied by a liquidated damages payment.  However, prior to December 31, 2000, Meadow Gold gave Lindner written notice that it intended to terminate the Lease (and not merely the tenancy).  *See* Pl's. Mot. for Partial Summ. J. Ex. 4 ("[T]he . . . Lease . . . has been terminated by Meadow Gold effective December 31, 2000.");  *Id.* Ex. 5 (requesting that Lindner meet with Meadow Gold to resolve "[t]he form and content of the written notice of the intent to terminate the lease . . . .").

6

> prevailing Bank of Hawaii prime rate charged to its most
> responsible commercial customers) of the minimum rent due
> for the remainder of the term of the Lease, but not more than
> the present value of five (5) years of rent.  The obligation to
> pay the present value of five (5) years rent shall apply during
> the initial ten (10) year term as well as during the three (3) five
> (5) year option periods described below, including Lessee's
> failure to exercise the option on any five (5) year option period.
> The foregoing payment shall constitute liquidated damages and
> not a penalty since the damages to be suffered by Lessor would
> be difficult to determine if Lessee were to terminate the Lease
> or fail to exercise any five (5) year option right.

Pl's. Mot. for Partial Summ. J. Ex. 1, Art. I § 2 (hereinafter "Lease").  Meadow

Gold remained responsible for the payment of liquidated damages notwithstanding

its assignment of the Lease to SFG.  *See* Lease Art. IV § 9 ("In the event of an

assignment . . . Lessee shall not be released from any liability or obligations under

the Lease, Lessor reserving all of its rights and remedies against Lessee

hereunder.").  Neither Meadow Gold nor SFG paid Lindner a lump sum liquidated

damages cash payment.  *See* Pl's. Mot. for Partial Summ. J., Lindner Decl. ¶ 8.

## B.    Procedural Background

Lindner filed suit on July 19, 2006, seeking in Count III a lump sum

cash liquidated damages payment.  Meadow Gold answered Lindner's Complaint

on November 16, 2006.  On December 1, 2006, Meadow Gold filed a Third-Party

Complaint against SFG.  On January 8, 2007, SFG answered Meadow Gold's

Third-Party Complaint and filed a Counterclaim against Meadow Gold.

On February 7, 2007, SFG filed a Motion for Partial Summary Judgment as to Counts I and II of Lindner's Complaint, which Meadow Gold joined. This court granted in part and denied in part SFG's Motion for Partial Summary Judgment, finding that some, but not all of Lindner's claims for additional rent were time-barred under Hawaii law. The court also ordered the parties into arbitration as to the remaining claims for additional rent due. *See generally Lindner v. Meadow Gold Dairies, Inc.*, 2007 WL 1430373 (D. Haw. May 14, 2007).

Lindner filed a Motion for Partial Summary Judgment as to his claim for liquidated damages contained in Count III on May 2, 2007. SFG filed a Countermotion for Partial Summary Judgment as to Count III on May 31, 2007, which Meadow Gold joined. Lindner filed his Reply on June 7, 2007; SFG filed its Reply on June 13, 2007. The court heard oral arguments on June 18, 2007.

### III.  <u>STANDARDS OF REVIEW</u>

**A.      Summary Judgment Standard**

A party is entitled to summary judgment where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding

the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, summary judgment will be mandated if the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

**B.     Choice of Law in Diversity Cases Brought Under 28 U.S.C. § 1332**

The court has diversity jurisdiction over Lindner's claims under 28 U.S.C. § 1332.  The court thus applies federal procedural rules and Hawaii substantive law.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  "In the absence of controlling state law, a 'federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case.'"  *Tirona v. State Farm Mut. Auto Ins. Co.*, 812 F. Supp. 1083, 1085 (D. Haw. 1993) (citations omitted).

\\\

\\\

\\\

9

# IV.  ANALYSIS

## A.      The Explicit Terms of the Lease Require a Lump Sum Liquidated Damages Cash Payment in the Event of Early Termination of the Lease

"Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Found. Int'l, Inc. v. E.T. Ige Const., Inc.*, 102 Haw. 487, 495, 78 P.3d 23, 31 (2003).  To determine whether an ambiguity exists, the court "should look no further than the four corners of the document," and examine "whether or not particular words or phrases in themselves be uncertain or doubtful in meaning." *Id.* at 496-97, 78 P.3d at 32-33 (citations omitted).  "A contract term or phrase is ambiguous only if it is capable of being reasonably understood in more than one way." *Wittig v. Allianz, A.G.*, 112 Haw. 195, 201, 145 P.3d 738, 745 (2006).

The language of the liquidated damages provision of the Lease is clear and unambiguous.  In the event of Lessee's early termination of the Lease, including an early termination during the renewal period, Article I § 2 requires the Lessee to pay Lessor "a lump sum cash payment representing the present value . . . of the minimum rent due for the remainder of the term of the Lease, but not more than the present value of five (5) years of rent."  Because the Lease was terminated a little under thirteen years early, Lindner is due a lump sum cash payment of the

10

present value of five years of rent.

SFG does not contest the reasonableness or validity of the liquidated damages provision itself.[7]  Instead, SFG contends that (1) the purpose of the Lease was frustrated and Meadow Gold's performance thereby excused and (2) Lindner failed to give Meadow Gold proper notice of its default, rendering his claim for liquidated damages invalid.  The court considers each argument in turn.

## B.   Meadow Gold's Performance Is Not Excused Under Frustration of Purpose Doctrine

SFG argues that the purpose of the Lease was frustrated and, as such, it should be excused from performance and not liable for liquidated damages for its early termination.  Because the only permissible use of the land under the terms of the Lease was the operation of a dairy farm and related pasture use, *see* Lease Art. IV §§ 7, 13, SFG argues that the Lease was frustrated when the downstream parcel was sold to Mandalay and Guber.  As Glenn Muranaka, the General Manager of SFG explains,

> The claims alleged by Mandalay . . . , the legal uncertainty and potential litigation costs with respect to those claims, the costs and burdens of regulations, particularly environmental

---

[7]  Under Hawaii law, a liquidated damages provision will be enforced if there is a "reasonable relation" between the amount of liquidated damages and the party's actual damages. *See Outrigger Wailea Resort v. Clear Channel Comm's, Inc.*, 266 F. Supp. 2d 1214, 1226 (D. Haw. 2003).

regulations as interpreted by Mandalay, placed on relatively small, locally based dairy operations and related pasture uses such as the Moloa'a Dairy, the realities of the market, and in the 1999-2000 time period the changing character of the area surrounding the Moloa'a Dairy's operation from traditional farming and pasture uses to high end subdivisions engineered to accommodate "gentlemen farmer estates," and Tara Plantation converged to substantially undermine and frustrate the principal purpose of the Lease which was operating a dairy farm and rendered the transaction senseless.

. . .

The basic assumptions upon which the parties entered into the Lease on October 1, 1988 did not contemplate the occurrences of the radical changes to the use of the lands that comprised Papa'a Bay Ranch, a claim by the owner of Tara Plantation that the pastures of Moloa'a Dairy comprised a "facility," within the meaning of 40 C.F.R. § 412.15(b), and the other developments described in paragraph 6 of this declaration that frustrated a continuing commercial dairy operation on the Premises.

SFG's Mot. for Partial Summ. J., Muranaka Decl. ¶¶ 6, 10.

Excuse by frustration of purpose of contract[8] requires the following:

_____

[8] Although it sometimes refers to performance being "impractical," SFG claims excuse by frustration of purpose of contract, not excuse by impossibility or commercial impracticability. The two doctrines are similar and the same facts may give rise to both theories. *Compare* RESTATEMENT (SECOND) OF CONTRACTS § 261 (discussing the doctrine of impossibility or impracticability, "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.") *with id.* § 265 (discussing frustration of purpose as "[w]here, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.").

(1) the purpose that was frustrated was a principal purpose of the contracting

party; (2) the frustration was substantial or severe; and (3) the event causing the

frustration was not foreseeable to the parties when they entered the Lease.  *See*

RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a ("First, the purpose that is

frustrated must have been a principal purpose of that party in making the contract.

. . .  Second, the frustration must be substantial.  It is not enough that the

transaction has become less profitable for the affected party or even that he will

sustain a loss.  The frustration must be so severe that it is not fairly to be regarded

as within the risks that he assumed under the contract.  Third, the non-occurrence

of the frustrating event must have been a basic assumption on which the contract

was made.").  The court finds that SFG has failed to satisfy the second and third

elements.

### 1.    *The Frustration Was Not Substantial or Severe*

SFG alleges that Mandalay and Guber's litigiousness and the

potentially applicable environmental laws and regulations imposed severe and

substantial hardships, making the operation of the Moloa'a Dairy Farm

commercially impracticable.  As SFG wrote in a September 22, 2000 letter to

Lindner,

Meadow Gold believes that the core fact is that this property

13

> cannot be practically used for a commercial dairy operation because of changes in the law arising from amendments to the Clean Water Act[9] and by the interpretation of those amendments and related rules and regulations by neighbors to the farm.  As one neighbor stated, "it's a good farm, but in a bad location."  Hence, the very purpose of the of the lease has been frustrated and made impractical of performance.

Pl's. Mot. for Summ. J. Ex. 6; SFG's Mot. for Summ. J. Ex. Q.

A lease is the conveyance of a property interest.  As the Lessee, Meadow Gold held an estate in land, and found itself facing increasing costs and hardships associated with its tenancy, including complying with environmental laws in the operation of its dairy farm operations.  These, however, are the hallmarks of the risks of a business, not excuses for breach of contract.  While compliance with the Clean Water Act and other environmental laws may have made Meadow Gold's performance more expensive or even unprofitable, it does not severely or substantially frustrate the purpose of the Lease.  *See* CORBIN ON CONTRACTS § 77.4 ("To justify a discharge, the lessee must show that the frustration of purpose is severe.  Inconvenience, unprofitability, and unexpected income reductions or cost increases will usually not suffice.").  As SFG itself admits in its briefing, "'[i]t is not enough that the transaction has become less

---

[9]  SFG did not clarify what specific changes or amendments to the applicable laws made performance impractical.

14

profitable for the affected party or even that [Meadow Gold] will sustain a loss.'"
SFG's Mot. for Partial Summ. J. 20 (*quoting* RESTATEMENT (SECOND) OF
CONTRACTS § 265 cmt. a).  Instead, as SFG also admits, "'[t]he frustration must be
so severe that it is not fairly to be regarded as within the risks that he assumed
under the contract.'"  *Id.*  A threatened lawsuit and the costs of bringing the
Moloa'a Dairy farm into compliance with federal law are not sufficiently severe to
excuse Meadow Gold's performance.  Meadow Gold could have continued to
operate the Moloa'a Dairy Farm on the leased premises so long as it complied with
the Clean Water Act.[10]  Nothing in the record shows that doing so would have
imposed severe economic hardship upon Meadow Gold.[11]  More importantly,
compliance with the Clean Water Act is required wherever Meadow Gold locates
its dairy farming operations and regardless of whether its downstream neighbor is
litigious.  Meadow Gold's decision to terminate the Lease -- rather than incur the
expenses of complying with federal law -- may indeed have been fiscally prudent,

---

[10]  The present case is thus distinguished from cases where newly-passed zoning
regulations outlaw commercial activity which is the sole subject of the contract.

[11]  SFG has not provided evidence as to the costs likely to be incurred to bring the
premises in compliance with the Clean Water Act.  The court is thus unable to conclude, based
on this record, that the expenses of compliance would be so excessive, extreme, or unreasonable
as to result in sufficiently severe or substantial hardship or commercial impracticability.  More to
the point, Meadow Gold has failed to demonstrate that the compliance costs arose after its
renewal of the Lease.  Legal compliance expenses that existed prior to signing of a Lease -- even
if not undertaken -- cannot excuse a subsequent failure to perform when lawsuits are threatened.

but it does not provide a legal basis excusing Meadow Gold from its contractual

obligations.

**2.     The Event Causing the Frustration Was Foreseeable to the Parties at the Time that They Entered into the Lease**

Nor was the event causing the alleged frustration unforeseeable to the

parties at the time Meadow Gold entered into the contract and renewed it.  First,

the obligation to comply with environmental standards was a stated and known

obligation.[12]  Indeed, the Lease explicitly required Meadow Gold to comply with

all present *and future* laws, statutes, ordinances, rules, and regulations, including

those concerning water pollution, hazardous wastes and environmental

contamination.  Lease Art. IV § 3 (requiring Lessee to "observe and perform all

laws, statutes, ordinances, rules and regulations now or hereafter made by any

governmental authority . . . including without limitation all laws statutes,

ordinances, rules and regulations concerning air and water pollution, hazardous

---

[12]  SFG argues that, at the time of renewing the lease, Meadow Gold could not have foreseen that the Papa'a Bay Ranch would be converted to a 46.5 million dollar home for a film production magnate.  Such an argument misses the point entirely: Meadow Gold was required to comply with federal environmental standards irrespective of whether its downstream neighbors were likely to protest.  It was the compliance cost (and perhaps a changing dairy market in Hawaii), not a new downstream neighbor, which ultimately forced Meadow Gold to abandon the Moloa'a Dairy Farm operations.

Even if the court were to accept SFG's argument that the acquisition of the land by Mandalay and Guber was in and of itself the causal event, the court would reject SFG's frustration argument on the grounds that Meadow Gold entered into the fifteen year renewal of the Lease four months *after* the downstream land parcel formerly occupied by Papa'a Bay Ranch was sold to Mandalay and Guber to be developed into the Tara Plantation.

wastes, environmental contamination . . . .").

Second, the Clean Water Act was adopted in 1948, with various amendments occurring thereafter.[13]  Meadow Gold and SFG were thus subject to -- and presumptively aware of -- the provisions of the Clean Water Act from the commencement of their tenure on the land.  Indeed, Meadow Gold appeared to be aware of its obligations under the Clean Water Act as it commissioned a waste management plan contemplating a "100 year 24-hour frequency storm flow elevation for [the adjacent] Papa'a Stream" and a "waste pond designed to store rainfall from a 25 year, 24-hour storm" as early as 1989.  Pl's. Mot. for Partial Summ. J. Ex. 14.

**C.    Lindner's Failure to Tender a "Notice of Default" When Meadow Gold Did Not Pay Liquidated Damages Does Not Defeat His Claim for Liquidated Damages**

SFG next argues that if payment of liquidated damages is required by Article I § 2, non-payment is a breach of a Lease covenant requiring notice of default by Lindner under Lease Article V § 1.  SFG thus contends that because Lindner failed to give proper notice of default under Article V § 1, his claim for liquidated damages under Article I § 2 must be dismissed.  Thus, even though

---

[13]  SFG does not point to any amendments adopted after Meadow Gold's renewal of the Lease which were unforeseeable and which frustrated its performance.

Lindner communicated his expectation and entitlement to the lump sum liquidated damages cash payment, SFG submits that his failure to tender his expectation in the specific format required by Article V § 1 renders his claim for liquidated damages per se invalid.

The notice of default provision in Article V § 1 provides

This demise is upon the express condition that . . . if Lessee shall fail to observe or perform any of the other covenants by Lessee herein contained, and such default shall continue for thirty (30) days after written notice thereof is given to Lessee (unless such default is of such a nature so as to reasonably require a longer period to cure, but in no event longer than ninety (90) days from the giving of the notice by Lessor) . . . Lessor may . . . at once re-enter the premises or any part thereof in the name of the whole and, upon or without such entry, at its option terminate this Lease, and may expel and remove from the premises Lessee and any persons claiming by, through or under Lessee and their effects without being deemed guilty of any trespass or becoming liable for any loss or damaged occasioned thereby, all without service of notice or legal process and without prejudice to any other remedy or right of action, including summary possession, which Lessor may have for arrears of rent or for the same or any preceding or other breach of contract.

Lease Art. V § 1.

Whether the notice requirement provision applies to all potential breaches of the Lease or only those breaches leading to the Lessor's re-entry and repossession of the land is a question of contract construction for the court.

18

*Found. Int'l, Inc.*, 102 Haw. at 494-95, 78 P.3d at 30-31.  Looking at the four corners of the Lease and applying standard principles of contract interpretation, the court rejects SFG's argument.[14]

Article V § 1 contemplates a continuing tenancy and addresses the condition required to be fulfilled -- namely, written notice of default tendered to Lessee -- prior to the Lessor's entry and repossession of the land.  In that situation, the notice requirement gives the Lessee a meaningful opportunity to cure its breaches or performance defects before it loses its possessory interest.  Article V § 1 does not create or anticipate a notice requirement as a condition precedent to

---

[14] Citing Black's Law Dictionary for the definition of a "covenant," SFG unconvincingly argues that the language of Lease Article V § 1(b) referring to "any of the other covenants by Lessee herein contained," pertains to any and all of Lessee's obligations under the Lease.  A reading of the entire provision, however, demonstrates that SFG's interpretation is overly broad. *See Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 10, 674 P.2d 390, 394 (1984) ("[A]n agreement should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause.") (citation omitted); *accord Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Haw. 77, 92, 148 P.2d 1179, 1194 (2006); *Hawaiian Isles Enters., Inc. v. City & County of Honolulu*, 76 Haw. 487, 491, 879 P.2d 1070, 1074 (1994).  Article V § 1 specifically addresses the obligations of the Lessor to give notice of default of a covenant prior to entering and repossessing the land.  The notice requirement is a condition precedent to the right of the Lessor to undertake a certain act, namely the termination of the Lessee's tenancy.  At the end of the Lease, Lindner had an absolute right to re-enter the premises, would have no need to terminate the Lease, and could not be deemed guilty of trespass.  Thus, Article V § 1(b)'s reference to "any of the other covenants by Lessee herein contained," are those covenants that could be breached *prior* to termination, such as those covenants contained in Article II, entitled "Rent," obligating the Lessee to pay minimum and percentage rent; Article IV, entitled "Lessee's Covenants," relating obligations of the Lessee pertaining to its possession and use of the land; and Article VI, entitled "Mutual Covenants."  Article V § 1's language requiring notice does not apply to obligations -- such as liquidated damage payments -- that arise *subsequent* to termination of the Lease and abandonment of the tenancy.

other actions taken by the Lessor subsequent to the termination of the lease and

abandonment by the Lessee of the tenancy.  Nor is there any language in Article I

§ 2, the liquidated damages provision, to suggest that the notice requirement was

crafted as a procedural barrier or condition precedent to the Lessor's collection of

liquidated damages after a Lessee's early termination of the Lease and

abandonment of the premises.[15]  In short, written notice under Article V § 1 is

_____

[15]  SFG cites *Aickin v. Ocean View Invs. Co.*, 84 Haw. 447, 459 n.20, 935 P.2d 992, 1004 n.20 (1997) as support for its argument.  *Aickin* is ultimately unavailing as it goes to the notice requirement as an element of materiality of a breach *prior* to eviction and repossession of the land by the Lessor.  In *Aickin*, the Hawaii Supreme Court found that the Lessees' failure to seek written consent from the Lessor prior to subleasing the leased commercial property did not constitute a material breach sufficient to justify the Lessor's repossession of the land in part because the Lessor "never provided Lessees with a thirty-day notice of default as required by § 17 of the lease . . . ."  *Id*. at 459, 935 P.2d at 1004.  The court recognized that prior to the denial of an option to renew the commercial lease, the terms of the lease required the Lessor to provide written notice to Lessees of their default, and that the Lessees had thirty days following this notice in which to cure their performance.  *See id*. at 459 n.20, 935 P.2d at 1004 n.20 (noting that the terms of the lease provided "This demise is made upon the express condition that if the Lessee . . . shall fail faithfully to observe or perform any of the of the other covenants herein contained . . . and such default shall continue for thirty (30) days after written notice thereof given to Lessee . . . .  Lessee shall not be in default of this Lease if Lessee commences to cure the default within the thirty (30) day period . . . .") (emphasis omitted).   Because the Lessor failed to provide written notice of the default, and because Lessees thus did not have a resulting thirty-day window following such notice in which to cure their performance, the court found that the Lessees' breach was not material.  *Id*. at 459, 935 P.2d at 1004.  The court ultimately reverted possession of the land to the Lessees.  *Id*. at 462, 935 P.2d at 1007.

*Aickin* and the notice of default provision in Article V § 1 would be outcome-determinative were this a case where Lindner had entered and repossessed the land over Meadow Gold's protests prior to September, 2013.  However, because this case involves Meadow Gold prematurely terminating the Lease and abandoning the property, neither *Aickin* nor the notice of default provision in Article V § 1 apply.  Other authority cited by SFG is similarly distinguished. *See, e.g., Gray v. Gregory*, 218 P.2d 307, 308 (Wash. 1950) (prior to terminating a lease and requiring a vacation of the premises, lessor must give notice and an opportunity to cure breach); *Consol. Gas Co. v. Rieckhoff*, 151 P.2d 588 (Mont. 1944) (requiring notice prior to quieting

(continued...)

required before Lindner may enter, expel Meadow Gold, and repossess the land; it does not serve as a procedural bar to other steps he may take.

In any event, even if Article V § 1 did apply to the circumstances presented to the court, Meadow Gold received effective notice of its failure to pay liquidated damages and had ample time to cure.  Meadow Gold was aware it was in default of its obligations to pay liquidated damages -- it twice requested that Lindner waive the liquidated damages provision.  *See* Pl's. Mot. for Partial Summ. J. Ex. 5; SFG's Mot. for Partial Summ. J. Ex. I (July 19, 2000 letter stating, "Meadow Gold requests that the liquidated damages provision be waived given the facts and circumstances surrounding the closure of the farm."); *see also* Pl's. Mot. for Partial Summ. J. Ex. 6; SFG's Mot. for Partial Summ. J. Ex. Q (September 22, 2000 letter stating "Meadow Gold's view is that there should be no liquidated damages because of the changes in the legal landscape affecting the operation of this farm.").  Lindner refused to do so, putting Meadow Gold and SFG on actual notice that he expected to receive a lump sum liquidated damages payment.[16]  *See* Pl's. Mot. for Summ. J. Ex. 15; SFG's Mot. for Partial Summ. J.

---

[15](...continued)
title).

[16]  During oral argument, SFG argued that Lindner failed to give sufficient notice because he did not use the word "default" in his correspondence.  *See* June 18, 2007 Tr. at 28-32.  The

(continued...)

Ex. R (January 2, 2001 letter stating "[I]n our view, at least the following issues remain to be resolved:  . . .  The amount of liquidated damages owed for the five year period post Lease termination."); *see also* Pl's. Mot. for Partial Summ. J. Ex. 16; SFG's Mot. for Partial Summ. J. Ex. S (January 10, 2001 letter noting that liquidated damages had not been paid and that "there was no agreement concerning liquidated damages").

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS the Plaintiff's Motion for Partial Summary Judgment and DENIES the Third-Party Defendant's Motion for Partial Summary Judgment as to liquidated damages (Count III).

\\\

\\\

\\\

\\\

\\\

\\\

---

[16](...continued)
court struggles to understand how Lindner's notice was insufficient given that the record clearly reveals that SFG's counsel was aware of the contractual obligation to pay liquidated damages and was attempting to negotiate away this provision on Meadow Gold's behalf.

The claims remaining in Plaintiff's Complaint include: Count I (as to minimum rent originally due on October 1, 2000; issue submitted to arbitration); Count II (as to percentage rent originally due on January 30, 2001; issue submitted to arbitration); Count IV (removal of permanent improvements); and Count V (restoration of the premises).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 9, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Third-Party Defendant's Countermotion for Partial Summary Judgment as to Count III (Liquidated Damages)