IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JEFFREY S. LINDNER, | ) | CIVIL NO.  06-00394 JMS/LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER DENYING THIRD-PARTY |
| | ) | DEFENDANT'S MOTION FOR |
| MEADOW GOLD DAIRIES, INC., | ) | PARTIAL SUMMARY JUDGMENT |
| | ) | AS TO COMPLAINT COUNTS IV |
| Defendant, Third- | ) | AND V, THIRD-PARTY |
| Party Plaintiff, and | ) | COMPLAINT COUNT I, AND |
| Counter Defendant, | ) | COUNTERCLAIM COUNT III; |
| | ) | ORDER DENYING PLAINTIFF'S |
| vs. | ) | MOTION TO FILE |
| | ) | SUPPLEMENTAL DECLARATIONS |
| SOUTHERN FOOD GROUP, INC., | ) | |
| | ) | |
| Third-Party | ) | |
| Defendant and | ) | |
| Counter Claimant. | ) | |
| _____ | ) | |

**ORDER DENYING THIRD-PARTY DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO COMPLAINT COUNTS IV
AND V, THIRD-PARTY COMPLAINT COUNT I, AND COUNTERCLAIM
COUNT III; ORDER DENYING PLAINTIFF'S MOTION TO FILE
SUPPLEMENTAL DECLARATIONS**

## I.  INTRODUCTION

Third-Party Defendant Southern Food Group, L.P. ("SFG") moves for

partial summary judgment as to Counts IV and V of Plaintiff Jeffrey Lindner's

("Lindner") Complaint and, by extension, Count I of Defendant and Third-Party

Plaintiff Meadow Gold Dairies, Inc.'s ("Meadow Gold") Third-Party Complaint and Count III of SFG's Counterclaim.  At issue is whether Meadow Gold is liable for failing to remove certain permanent improvements and restore the land to its pre-Lease condition when it terminated its Lease with Lindner.  The court finds that there are genuine issues of material fact as to both Count IV (regarding the removal of certain structural improvements) and Count V (restoration of the premises).  The court thus DENIES SFG's Motion for Partial Summary Judgment. The court also DENIES Lindner's Ex Parte Motion for Leave to File Supplemental Declarations.[1]

## II. <u>BACKGROUND</u>

Two prior rounds of motions for partial summary judgment have been decided by the court in this case.  *See Lindner v. Meadow Gold Dairies, Inc.*, 2007 WL 1430373 (D. Haw. May 14, 2007); *Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Docket No. 197 (August 9, 2007): Order Granting Pl's. Mot. for Partial Summ. J. and Denying Def's. Countermotion for Partial Summ. J. as to Count III (Liquidated Damages).

---

[1] In a footnote in its Memorandum in Opposition, Lindner writes that "Plaintiff herein provides prima facie evidence proving his claims for liability for Counts IV and V.  Southern Foods failed to provide such facts in its Motion making summary judgment in its favor inappropriate; in fact, such failure makes summary judgment appropriate for Plaintiff."  Pl's. Mem. in Opp'n 1 n.2.  To the extent that Lindner intended this footnote to serve as a countermotion for partial summary judgment, it is also DENIED.

## A.     Factual Background

Lindner is the fee simple owner of land located on the island of Kauai.  Lindner acquired the land from Amfac Property Development Corporation ("Amfac").  In 1988, Amfac had leased a portion of the land to Meadow Gold ("Lease") for the operation of a dairy farm ("Moloa'a Dairy Farm").  When Lindner acquired the land in 1996, Amfac also assigned him its interests and obligations under the Lease.

In 1997, Meadow Gold exercised its renewal options under the Lease, thereby extending the Lease until September 30, 2013.  Shortly thereafter, Meadow Gold assigned its interests under the Lease to SFG.[2]

The Moloa'a Dairy Farm had the highest density of cows on a dry lot dairy on Kauai.  *See* Pl's. Mem. in Opp'n, Ching Decl. ¶ 8.  Meadow Gold utilized a portion of the land as a "cattle graveyard," burying over twelve hundred carcasses onsite.  In June 1999, Lindner sent Meadow Gold a letter complaining that the dead and decomposing cattle were polluting Papa'a Stream, which bordered the leased land, and demanding that Meadow Gold "[i]mmediately cease

---

[2] Lindner contests the validity of this assignment.  *See Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Docket No. 197 (August 9, 2007): Order Granting Pl's. Mot. for Partial Summ. J. and Denying Def's. Countermotion for Partial Summ. J. as to Count III (Liquidated Damages) at n.2.

3

its practice of disposing cattle carcasses other than in a manner which meets

practices of good husbandry and all applicable laws and regulations."  SFG's Mot.

for Partial Summ. J. Ex. H.  The Lease's "Practice of Good Husbandry" covenant

provides:

> In the use of the premises for dairy operations and related
> pasture use, Lessee, except insofar as it may be prevented from
> doing so by an Act of God, the public enemy, fire, strikes or
> other unavoidable casualty or cause, shall practice good
> husbandry as defined in this Lease.  Lessee shall use the
> premises in such a manner as to maintain the fertility of the soil
> and shall continue so to do during the term of this Lease with
> all reasonable skill, care, prudence and diligence.

SFG's Mot. for Partial Summ. J. Ex. A, Art. IV § 13 (hereinafter "Lease").  The

Lease defines "good husbandry" as:

> The phrase "practice of good husbandry" shall mean good
> husbandry as practiced generally by the sugar and cattle
> industry in the State of Hawaii and shall, without being
> restricted thereto, include the prevention or elimination of
> waste; the employment of routine soil conservation practices to
> prevent or arrest loss of soil by erosion; the fertilization of
> areas subject to cultivation with organic and inorganic
> fertilizers; the control of "noxious weeds" as defined herein;
> the taking of all steps reasonably necessary to assure against
> any damage to the water or other natural resources of the
> premises by the activities of Lessee; and compliance with the
> highest applicable standards made or adopted pursuant to law
> in prevention of air and water pollution.

Lease Art. VI § 6(a).

4

By return letter dated July 6, 1999, Meadow Gold asserted that the "dead animals, a dog and a cock" buried near the Papa'a Stream were actually on Lindner's property, not the portion of land leased by Meadow Gold.  Further, Meadow Gold claimed that it "ha[d] invested several thousand dollars in an improved system for disposing of animal carcasses.  This include[d] digging a large ten-foot-deep trench, well away from Papa'a Stream, in which carcasses are buried.  Lime is applied to the carcasses that are buried in the trench to speed the natural process of decomposition."  SFG's Mot. for Partial Summ. J. Ex. J.

In 1999, Meadow Gold's release of cattle manure and wastewater into the Papa'a Stream lead downstream neighbor Peter Guber ("Guber"), principal of Mandalay Inc. and current chairman and owner of film production company Mandalay Entertainment, to file a complaint with the State of Hawaii Department of Health.  The Department of Health fined Meadow Gold.  *See* Pl's. Mem. in Opp'n Ex. 7.  The Department of Health also requested that Meadow Gold apply for a National Pollution Discharge Elimination System permit and to submit a "comprehensive animal waste management plan."  *See* Pl's Mem. in Opp'n Ex. 5. Guber also threatened to sue Lindner and Meadow Gold, alleging that the practices of the Moloa'a Dairy Farm violated various environmental laws and regulations and seeking the maximum civil penalty of $25,000 per day per

violation.  Following these incidents, Meadow Gold constructed several berms and swales across the property, apparently without Lindner's consent, to contain the cattle waste.

In July 2000, Meadow Gold informed Lindner that it would be terminating the Lease and abandoning its tenancy effective December 31, 2000, a little under thirteen years early.  SFG's counsel, C. Michael Heihre ("Heihre"), apparently acting for Meadow Gold, wrote several letters to Lindner asking for an "election" as to the structures Lindner wanted removed from the property.  *See* SFG's Mot. for Partial Summ. J. Exs. B, C, D, E & F.  SFG claims that Lindner did not make the required election prior to Lease's termination on December 31, 2000.  At the time that it surrendered the premises, Meadow Gold left behind various roads, a milking barn, a hospital barn, utilities, underground irrigation systems, a white water tank, and a green metal tank.  Meadow Gold argues that such action was appropriate under Article IV § 16 which required Meadow Gold to surrender its possession of the premises, "together with the possession of and title to all buildings and other permanent improvements."

Lindner asserts that he verbally communicated his desire that these structures be removed to Heihre sometime in 2000.  Lindner attests that he and Heihre also discussed arranging for Lindner to undertake the demolition at

Meadow Gold's cost.  Pl's. Mem. in Opp'n, Lindner Decl. ¶¶ 42-45; *Id.* Ex. 1.  In

a January 2, 2001 letter, Lindner asked Meadow Gold to remove certain

underground irrigation systems, excavate and clear the cattle graveyard, regrade

the berms and swells, and the like.  The included list was not meant to be

exhaustive and additional issues were anticipated pending Lindner's inspection of

the premises.  Pl's. Mem. in Opp'n Ex. 3.  Lindner thus argues that Meadow

Gold's failure to remove the structures or pay for their demolition was a breach of

Article IV § 16 which requires "that in Lessor's discretion Lessor may require that

all buildings, building pads, foundations, fences or other improvements

constructed by Lessee during the term shall be removed."[3]

Lindner also asserts that Meadow Gold's failure to remove the cattle

---

[3]  In full, Article IV § 16 reads

> At the expiration of the term or sooner termination, Lessee shall peaceably
> surrender and deliver up to Lessor possession of the premises, together
> with the possession of and title to all buildings and other permanent
> improvements of whatever kind or nature thereon, but not including
> automotive or portable machinery or equipment which in a dairy operation
> and related pasture use is customarily moved from place to place upon said
> premises, in substantial good order and condition, reasonable wear and
> tear and damage by the elements or other unavoidable casualty not herein
> required to be insured against excepted; provided, however, that in
> Lessor's discretion Lessor may require that all buildings, building pads,
> foundations, fences or other improvements constructed by Lessee during
> the term shall be removed and the premises restored, to the greatest extent
> possible, to the condition they were in at the commencement of this Lease.

Lease Art. IV § 16.

carcasses from the cattle graveyard constitutes waste in contravention of Article

IV § 8: "Lessee shall not make or suffer any strip or waste or any unlawful,

improper or offensive use of the premises or of any part thereof or improvements

thereon."

For its part, SFG argues that Lindner's claims are barred because he

failed to give proper notice of default under Article V § 1.  That provision allows

Lindner to re-enter the premises, expel Meadow Gold from the land, and terminate

the Lease in circumstances in which Meadow Gold has breached the Lease but

failed to cure its defaults after receiving written notice from Lindner.

**B.   Procedural Background**

Lindner filed suit on July 19, 2006, seeking in Count IV removal of

permanent improvements and in Count V restoration of the premises to their pre-

Lease condition.  On December 1, 2006, Meadow Gold filed a Third-Party

Complaint against SFG, seeking in Count I contributions and indemnification for

its potential liability.  On January 8, 2007, SFG filed a Counterclaim against

Meadow Gold, claiming in Count III that it had met its obligations with respect to

Lindner's removal and restoration claims.

On February 7, 2007, SFG filed a Motion for Partial Summary

Judgment as to Counts I and II of Lindner's Complaint, which Meadow Gold

joined.  This court granted in part and denied in part SFG's Motion for Partial

Summary Judgment as to Counts I and II, finding that some, but not all of

Lindner's claims for additional rent were time-barred under Hawaii law.  The

court ordered the parties into arbitration as to the remaining claims for additional

rent due.  *See generally Lindner v. Meadow Gold Dairies, Inc.*, 2007 WL 1430373

(D. Haw. May 14, 2007).

       Lindner and SFG both moved for partial summary judgment as to

Lindner's claim for liquidated damages (Count III).  The court granted Lindner's

Motion for Partial Summary Judgment and denied SFG's Motion for Partial

Summary Judgment finding that Lindner was entitled to a liquidated damages

payment because SFG prematurely terminated the Lease and SFG's breach was

not excused by frustration or rendered null by Lindner's failure to provide notice

of default.  *See Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394

JMS/LEK, Docket No. 197 (August 9, 2007): Order Granting Pl's. Mot. for Partial

Summ. J. and Denying Def's. Countermotion for Partial Summ. J. as to Count III

(Liquidated Damages).

       Presently before the court is SFG's Motion for Partial Summary

Judgment as to Counts IV and V of Lindner's Complaint; Count I of the Third-

Party Complaint; and Count III of the Counterclaim on April 20, 2007.  Lindner

filed his Memorandum in Opposition on May 31, 2007.  SFG filed its Reply on

June 7, 2007.  On June 12, 2007, Lindner filed an Ex Parte Motion for Leave to

File Supplemental Declarations of S.K. Djou and Tim O'Byrne, two of Lindner's

expert witnesses upon whose reports Lindner relied in his Memorandum in

Opposition.  SFG filed its Opposition on June 13, 2007.  Lindner filed his Reply

on June 15, 2007.  Meadow Gold filed a joinder to SFG's Motion for Partial

Summary Judgment with respect to Lindner's Count IV and V claims on June 18,

2007.  The court heard oral arguments on that same day.

### III.  <u>STANDARDS OF REVIEW</u>

**A.     Summary Judgment Standard**

A party is entitled to summary judgment where there is no genuine

issue of material fact.  Fed. R. Civ. P. 56(c).  When reviewing a motion for

summary judgment, the court construes the evidence -- and any dispute regarding

the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro.*

*Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal

purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  Thus, summary judgment will be mandated if the non-moving party "'fails

to make a showing sufficient to establish the existence of an element essential to

10

that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258

(9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

**B.      Choice of Law in Diversity Cases Brought Under 28 U.S.C. § 1332**

The court has diversity jurisdiction over Lindner's claims under 28

U.S.C. § 1332.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal

courts sitting in diversity cases apply federal procedural rules and substantive state

law.  "In the absence of controlling state law, a 'federal court sitting in diversity

must use its own best judgment in predicting how the state's highest court would

decide the case.'"  *Tirona v. State Farm Mut. Auto Ins. Co.*, 812 F. Supp. 1083,

1085 (D. Haw. 1993) (citations omitted).

## IV. <u>ANALYSIS</u>

**A.      Motion for Leave to File Supplemental Declarations**

Lindner filed a motion requesting leave to file certain declarations

that he had neglected to attach when filing his Memorandum in Opposition to

SFG's Motion for Partial Summary Judgment.  Specifically, Lindner sought to

include additional declarations and background information from S.K. Djou and

Tim O'Bryne, two experts upon whose opinion Lindner's Memorandum in

Opposition relies.  Lindner fails to set forth the reasons for his original oversight.

Seeing no good cause for the delay and in light of the potential prejudice to SFG,

11

the court DENIES Lindner's Motion for Leave to file Supplemental Declarations.

Further, this Order does not rely on the Djou or O'Bryne reports in reaching its

conclusion.

## B.     Notice Requirement

SFG argues that Plaintiff's claims in Counts IV and V fail as a matter

of law because Lindner neglected to give proper notice of Meadow Gold's

performance defects under Article V § 1 and that Meadow Gold was denied the

resulting opportunity to cure.  Article V § 1 provides:

> This demise is upon the express condition that . . . if Lessee
> shall fail to observe or perform any of the other covenants by
> Lessee herein contained, and such default shall continue for
> thirty (30) days after written notice thereof is given to Lessee
> (unless such default is of such a nature so as to reasonably
> require a longer period to cure, but in no event longer than
> ninety (90) days from the giving of the notice by Lessor) . . .
> Lessor may . . . at once re-enter the premises or any part thereof
> in the name of the whole, and, upon or without such entry, at its
> option terminate this Lease, and may expel and remove from
> the premises Lessee and any persons claiming by, through or
> under Lessee and their effects without being deemed guilty of
> any trespass or becoming liable for any loss or damaged
> occasioned thereby, all without service of notice or legal
> process and without prejudice to any other remedy or right of
> action, including summary possession, which Lessor may have
> for arrears of rent or for the same or any preceding or other
> breach of contract.

Lease Art. V § 1.  SFG argues that under the Hawaii Supreme Court's

interpretation of similar language in *Aickin v. Ocean View Investments Co.*, 84 Haw. 447, 935 P.2d 992 (1997), Plaintiff was required to give Meadow Gold notice of default as to any and all performance defects, including alleged failure to properly remove structural improvements (as contained in Count IV) and failure to remove cattle carcasses, berms and swells, and the like (as contained in Count V). SFG does not argue that it was entirely unaware of Plaintiff's demands, but instead submits that Plaintiff's failure to provide specific written notice of default constitutes a procedural failure sufficient as a matter of law to deny Plaintiff recourse under the terms of the Lease.

The court rejects SFG's argument.  *See also Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Docket No. 197 (August 9, 2007): Order Granting Pl's. Mot. for Partial Summ. J. and Denying Def's. Countermotion for Partial Summ. J. as to Count III (Liquidated Damages) (rejecting SFG's argument that Lindner's failure to provide a specific notice of default barred his claim for liquidated damages). *Aickin* is ultimately unavailing to SFG.  In *Aickin*, the court was asked to determine whether, under equitable principles, the lessees' defaults constituted a material breach sufficient to justify the lessor's repossession

of the property.[4]  The Court reasoned that because the lessor did not give the

lessees notice of their default as required by the terms of the lease -- and because

the lessees did not have a thirty-day opportunity to cure their defective

performance -- the lessees' defaults did not constitute material breaches of the

lease and the lessor was not entitled to repossess the property.[5]  *Aickin*, 84 Haw. at

459 n.20, 935 P.2d at 1004 n.20.

> *Aickin* thus holds that where the relevant language of a lease requires

notice of default prior to a lessor's re-entry and repossession of land, a lessor must

provide a notice of default specifying the lessee's performance defects and a

meaningful opportunity to cure before the lessor may terminate the lease and evict

the lessee.  The notice requirement is a condition precedent to a lessor's entry and

repossession of the land.  As such, it protects the possessory interests of the lessee

from unintentional, inadvertent, or negligent waiver.  However, nothing in *Aickin*

holds that lessors are *always* required to give notice to lessees of any and all

breaches before pursuing means of redress other than re-entry, expulsion of the

-----

[4] *Aickin* addressed whether the lessees should be permitted -- over the lessor's objection -- to exercise an option to renew their lease even though they had previously subleased the commercial property without the prior consent of the lessor, which was required under the lease.

[5] The *Aickin* lease provided that "[l]essee shall not be in default" of the lease where the lessee commenced curing the breach within a 30-day period following the lessor's written notice of default.  This "shall not be in default" provision is not contained in the Lindner/Meadow Gold Lease.

lessee, and repossession of the land.

The Lease language at issue here -- largely identical to that in *Aickin*, but without its caveat that a commencement of cure of the breach prevents the Lessee from being in default -- provides that notice is required before Lindner undertakes certain actions, namely reentry, expulsion, and repossession of the land. "Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Found. Int'l, Inc. v. E.T. Ige Const., Inc.*, 102 Haw. 487, 495, 78 P.3d 23, 31 (2003). Under the plain language of the Article V § 1, the notice of default requirement is a condition precedent *only* to Lindner "re-enter[ing] the premises," "terminate[ing] the Lease," and/or "expel[ing] and remov[ing]" Meadow Gold from the premises.[6] Article V § 1's language does not extend the notice requirement to other, unlisted acts by the Lessor. Nor is there any indication elsewhere in the Lease that the notice of default requirement was contemplated as a bar to the Lessor's right to pursue damages subsequent to, and resulting from, the early termination of the Lease. *See Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 10, 674 P.2d 390, 394 (1984) ("[A]n agreement should be construed as a whole and its meaning

---

[6] Under Article V § 1, Lindner may take these steps without prejudice to his other rights or remedies.

15

determined from the entire context and not from any particular word, phrase, or

clause.") (citation omitted); *accord Hawaii Med. Ass'n v. Hawaii Med. Serv.*

*Ass'n, Inc.*, 113 Haw. 77, 92, 148 P.2d 1179, 1194 (2006); *Hawaiian Isles Enters.,*

*Inc. v. City & County of Honolulu*, 76 Haw. 487, 491, 879 P.2d 1070, 1074 (1994).

Finally, Meadow Gold's assertion that it did not have an opportunity

to investigate and cure the defects in its performance and to thereby minimize

damages (including avoiding the expense of litigation) prior to the filing of the

present suit is unconvincing.  While Lindner may or may not have given notice of

his desire to have certain structures and organic remains removed before the

December 31, 2000 termination of the Lease, it is quite clear that Meadow Gold

knew of Lindner's expectations at the latest by early January 2, 2001, only two

days after the termination of the Lease and approximately 5.5 years prior to the

filing of the present suit.

## C.    Count IV: Removal of Permanent Improvements

Lindner alleges that Meadow Gold failed to remove a milking barn,

hospital barn, various roads, a white water tank, a green metal tank, utilities, and

underground irrigation systems as required by the Lease.  *See* Compl. ¶ 24.  The

Lease provides:

At the expiration of the term or sooner termination, Lessee

16

shall peaceably surrender and deliver up to Lessor possession of the premises, together with the possession of and title to all buildings and other permanent improvements of whatever kind or nature thereon, but not including automotive or portable machinery or equipment which in a dairy operation and related pasture use is customarily moved from place to place upon said premises, in substantial good order and condition, reasonable wear and tear and damage by the elements or other unavoidable casualty not herein required to be insured against excepted; provided, however, that in Lessor's discretion Lessor may require that all buildings, building pads, foundations, fences or other improvements constructed by Lessee during the term shall be removed and the premises restored, to the greatest extent possible, to the condition they were in at the commencement of this Lease.

Lease Art. IV § 16.  SFG argues that Lindner's claim should be denied as a matter of law because Lindner failed to elect the items that he wished removed until after the Lease had been terminated.  The court rejects this argument.

There is a genuine issue of material fact as to whether Lindner gave Meadow Gold sufficient notice of his expectations *before* the termination of the Lease.  Lindner argues that he gave Heihre verbal notice of his demands in a telephone conversation sometime in September 2000 and that the two engaged in negotiations as to whether Meadow Gold would remove the structures or would pay Lindner to have them demolished.  Pl's. Mem. in Opp'n, Lindner Decl. ¶¶ 42-45.  Although SFG argues that written correspondence suggests no such communication took place, the court does not weigh evidence at the summary

17

judgment stage.  Lindner also provides permit applications for the demolition of buildings filed in October of 2000, which may indicate that some sort of discussion or planning regarding demolition activity occurred prior to the termination of the Lease.  *Id.* Ex. 1.  SFG's Motion for Partial Summary Judgment as to Count IV is DENIED.

## D.    Count V: Restoration of Premises

Lindner claims that Meadow Gold was required to remove the parts or remains of the over twelve hundred dead cattle and related matter it buried on the premises over the years; regrade the berms and swales; and restore other areas to their pre-Lease condition.  According to Lindner, Meadow Gold's failure to do so violates various covenants of the Lease.  *See* Compl. ¶ 60.

In response, SFG asserts that its burial of the cattle and grading practices on the leased premises comported with Hawaii state law and the "Use of the Premises and Practice of Good Husbandry" Lease covenant, and, as such, constituted "normal wear and tear" of a dairy operation.  The good husbandry provision provides:

> In the use of the premises for dairy operations and related pasture use, Lessee, except insofar as it may be prevented from doing so by an Act of God, the public enemy, fire, strikes or other unavoidable casualty or cause, shall practice good husbandry as defined in this Lease.  Lessee shall use the

18

premises in such a manner as to maintain the fertility of the soil and shall continue so to do during the term of this Lease with all reasonable skill, care, prudence and diligence.

Lease Art. IV § 13.  The Lease defines "good husbandry" as:

The phrase "practice of good husbandry" shall mean good husbandry as practiced generally by the sugar and cattle industry in the State of Hawaii and shall, without being restricted thereto, include the prevention or elimination of waste; the employment of routine soil conservation practices to prevent or arrest loss of soil by erosion; the fertilization of areas subject to cultivation with organic and inorganic fertilizers; the control of "noxious weeds" as defined herein; the taking of all steps reasonably necessary to assure against any damage to the water or other natural resources of the premises by the activities of Lessee; and compliance with the highest applicable standards made or adopted pursuant to law in prevention of air and water pollution.

Lease Art. VI § 6(a).

Because the Lease required that the premises be used for "dairy operations and related pasture use," *see* Lease Art. IV § 13, SFG argues that lawful burial of cattle and grading is an incidental, anticipated, and common occurrence of dairy and pasture operations.  SFG thus argues that Meadow Gold was not required to remove the cattle remains.

While Meadow Gold's practices may have been consistent with state

19

law,[7] the Lease does not limit practice to those made lawful but requires

> good husbandry as practiced generally by the sugar and cattle
> industry in the State of Hawaii . . . the taking of all steps
> reasonably necessary to assure against any damage to the water
> or other natural resources of the premises by the activities of
> Lessee; and compliance with the highest applicable standards
> made or adopted pursuant to law in prevention of air and water
> pollution.

Lease Art. VI § 6(a).  Although SFG has produced evidence that they did not run

afoul of the law, they have not shown that the practiced "good husbandry" as

defined in the Lease.[8]  Moreover, contrary to SFG's arguments, burial of the cattle

---

[7] The Hawaii Department of Health apparently

> allow[s] a producer three methods to dispose of dead cattle carcasses.
> 1.    You may bury it on site with sufficient soil (about 2 feet) over the
>       top to prevent dogs or other animals from digging up the carcasses.
> 2.    You may haul the carcasses to the landfill for reburial.  The county
>       needs to be notified and there probably is a tipping fee required.
> 3.    You may burn the carcass on site.  Clean fuel as lumber or wood is
>       required.  No old tires as a fuel source can be used.

SFG's Mot. for Partial Summ. J. Ex. I.

[8] In a letter to Lindner, counsel for Meadow Gold stated that "Lincoln Ching ["Ching"], the Department of Agriculture's extension service agent for Kauai, and Gary Uten, of the Department of Health Clean Water Branch, have assured Meadow Gold that this procedure complies with applicable state law and practices of good husbandry."  SFG's Mot. for Partial Summ. J. Ex. J.  However, while the letter from Ching discussed lawful methods of disposing of cattle, it did not discuss whether this particular method met good husbandry standards.  Indeed, Ching has declared that he is not competent to testify as to the applicable good husbandry standard.  Pl's Mem. in Opp'n, Ching Decl. ¶¶ 2-5, 10-11.  SFG has not provided the court with any evidence as to Uten's statements.  Thus, Meadow Gold has only demonstrated that it complied with the laws; it has not demonstrated that it complied with the specific definition of "good husbandry" set forth in Article VI § 6(a).

on the leased property was not an inevitable result of a dairy farming operation since there were other disposal methods (including offsite burial sites or burning of the carcasses) available.  SFG has thus failed to demonstrate, at the summary judgment stage, that no genuine issue of material fact exists as to whether Meadow Gold's use of the leased land as a cattle graveyard constituted good husbandry. Moreover, SFG has also failed to show that it restored the land in the condition required by Article IV § 16 (requiring Meadow Gold to "deliver up to Lessor possession of the premises . . . in substantial good order and condition . . . .").  The questions of whether Meadow Gold's cattle disposal methods were good husbandry, and whether Meadow Gold sufficiently restored the leased land, are questions for the trier of fact to decide.  SFG's Motion for Partial Summary Judgment as to Count V is DENIED.

## V.  CONCLUSION

The court DENIES the Plaintiff's Motion for Leave to File Supplemental Declarations.  The court also finds that there are genuine issues of material fact as to Plaintiff's claims in Counts IV and V.  As such, the Third-Party Defendant's Motion for Partial Summary Judgment is DENIED.

The claims remaining in Plaintiff's Complaint include: Count I (as to minimum rent originally due on October 1, 2000; issue submitted to arbitration);

Count II (as to percentage rent originally due on January 30, 2001; issue submitted to arbitration); Count IV (removal of permanent improvements); and Count V (restoration of the premises).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 10, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Lindner v. Meadow Gold Dairies, Inc.*, Civ. No. 06-00394 JMS/LEK, Order Denying Third Party Defendant's Motion for Partial Summary Judgment as to Complaint Counts IV and V, Third-Party Complaint Count I, and Counterclaim Count III; Order Denying Plaintiff's Motion to File Supplemental Declarations